1  Alan M. Mansfield (SBN 125998)
   alan@clgca.com
2  THE CONSUMER LAW GROUP
   10200 Willow Creek Rd, Suite 160
3  San Diego, CA 92131
   Tel: (619) 308-5034
4  Fax: (888) 341-5048

5  WHATLEY DRAKE & KALLAS LLC
   Joe R. Whatley, Esq.
6  jwhately@wdklaw.com
   Patrick J. Sheehan, Esq. (Admitted *Pro Hac Vice*)
7  psheehan@wdklaw.com
   380 Madison Ave, 23rd Floor
8  New York, NY 10017                          REDACTED
   Tel: (212) 447-7070
9  Fax: (212) 447-7077

10  Attorneys for Plaintiffs

11

12              **UNITED STATES DISTRICT COURT**

13            **SOUTHERN DISTRICT OF CALIFORNIA**

14  VLASTIMIL SAJFR and DAVID              CASE NO.: 10-cv- 2341-AJB (NLSx)
    KEEPORTS, on behalf of themselves and
15  all others similarly situated,          **CLASS ACTION**

16            Plaintiffs,                   **PLAINTIFFS' MEMORANDUM OF
                                            POINTS AND AUTHORITIES IN**
17        v.                                **OPPOSITION TO DEFENDANT BBG
                                            COMMUNICATIONS, INC.'S MOTION TO**
18  BBG COMMUNICATIONS, INC., and          **FOR SUMMARY JUDGMENT**
    DOES 1-10 INCLUSIVE,
19                                          Date:        **December 16, 2011**
            Defendants.                     Time:        **1:30 p.m.**
20                                          Courtroom:   **13**
                                            Judge:       **Hon. Anthony J. Battaglia**
21
                                            **Complaint Filed: November 12, 2010**
22

23

24

25

26

27

28
    MEMO OF P&As IN OPP. TO BBG MOTION FOR                    CASE NO : 10-CV-2341-AJB (NLSx)
    SUMMARY JUDGMENT

1

# **TABLE OF CONTENTS**

2                                                                                                      **Page**

3   I.     INTRODUCTION AND SUMMARY OF ARGUMENT ...................................................1

4   II.    SUMMARY OF DISPUTED MATERIAL FACTS ...........................................................3

5   III.   THE STANDARD ON A SUMMARY JUDGMENT MOTION ......................................9

6   IV.    WHILE THERE ARE DISPUTED FACTS AS TO PLAINTIFFS' "ALTER
           EGO" ALLEGATIONS THAT PRECLUDE SUMMARY JUDGMENT, THAT
7          IS NOT THE SOLE BASIS UPON WHICH BBG COMMUNICATIONS IS
           NAMED AS A DEFENDANT........................................................................................ 10
8
    V.     PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE PRESUMPTION AGAINST
9          EXTRATERRITORIALITY .......................................................................................... 13

10  VI.    THE DOCTRINE OF INTERNATIONAL COMITY DOES NOT MANDATE
           DISMISSAL OF PLAINTIFFS' CLAIMS.................................................................... 15
11
    VII.   CHOICE OF LAW ISSUES DO NOT WARRANT DISMISSAL OF PLAINTIFFS'
12         CLAIMS AGAINST BBG........................................................................................... 15

13  VIII.  PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE "DORMANT
           COMMERCE CLAUSE" ............................................................................................. 16
14
    IX.    THERE IS NO APPLICABLE "SAFE HARBOR" BAR THAT
15         PRECLUDES PLAINTIFFS' CLAIMS UNDER THE UCL ......................................... 18

16  X.     PLAINTIFFS PROPERLY SHOW BBG HAS ENGAGED IN "UNFAIR" ACTS
           AND PRACTICES ....................................................................................................... 19
17
    XI.    PLAINTIFFS MAY PROPERLY ASSERT A PENAL CODE SECTION 632 CLAIM
18         NO MATTER WHERE THE CALL CENTER IS LOCATED BASED ON THE
           PRESENCE OF THE SUB-CLASS MEMBERS IN CALIFORNIA .............................. 20
19
    XII.   THE MOTION MUST BE DENIED OR CONTINUED BASED ON BBG'S
20         FAILURE TO COMPLY WITH ITS DISCOVERY OBLIGATIONS ........................... 25

21  XIII.  CONCLUSION............................................................................................................ 25

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2
Page

3

## FEDERAL CASES

4 *Alaska Packers Assn. v. Industrial Accident Comm'n*, 294 U.S. 532 (1935) ............................... 14

5 *Allstate Ins. Co. v. Hague*, 449 U.S. 302 (1981) ......................................................................... 13

6 *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................. 10

7 *Brinson v. Linda rose Joint Venture*, 53 F.3d 1044 (9th Cir. 1995) ............................................... 9

8 *Brown-Forman Distillers Corp. v. New York State Liquor Authority*, (1986) 476
    U.S. 573 ........................................................................................................................................ 16

9
   *Cardillo v. Liberty Mutual Ins. Co.*, 330 U.S. 469 (1947) ........................................................... 13

10
   *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................................................ 9, 25

11
   *Church v. Consol. Freightways*, 1992 WL 370829 (N.D. Cal. Sept. 14, 1992) ........................... 17

12
   *Dependable Highway Express, Inc. v. Navigators Ins. Co.*, 498 F.3d 1059 (9th Cir. 2007)......... 15

13
   *Edgar v. MITE Corp.* (1982) 457 U.S. 624 ................................................................................. 16

14
   *Environmental Defense Fund v. Massey*, 986 F.2d 528 (D.C. Cir. 1993) ................................... 14

15
   *Experience Hendrix, L.L.C. v. HendrixLicensing.com, LTDF*, 766 F.Supp.3d 1122
16     (W.D. Wash. 2011) ..................................................................................................................... 18

17 *Freeman v. Arpaio*, 125 F.3d 732 (9th Cir. 1997) ........................................................................ 10

18 *H.K. & Shanghai Banking Corp. v. Simon (in Re Simon)*, 153 F.3d 991 (9th Cir. 1998) ............. 14

19 *Healy v. Beer Inst., Inc.*, 491 U.S. 324 (1989)........................................................................ 17, 18

20 *Hilton v. Gilot*, 159 U.S. 113 (1895)............................................................................................ 15

21 *Hughes v. Oklahoma* (1979) 441 U.S. 322 .................................................................................. 16

22 *Lippett v. Raymond James Fin. Servs.*, 340 F.3d 1033 (9th Cir. 2003) [*amended* 2003
    U.S. App. LEXIS 19524 (9th Cir. 2003)] ................................................................................... 18
23
   *Membrila v. Receivables Perf. Mgt. LLC*, 2010 WL 1407274 (S.D. Cal., Apr. 10, 2010)........... 24
24
   *Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38 (1st Cir. 1999)......................................... 18
25
   *Pakootas v. Teck Cominco Metals, Ltd.*, 452 F.3d 1066 (9th Cir. 2006)...................................... 14
26
   *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970) ........................................................................ 16
27
   *Rosenthal v. Warren*, 475 F.2d 438 (2nd Cir. 1973)..................................................................... 14
28

## TABLE OF AUTHORITIES

Page

### FEDERAL CASES (CONT'D)

*Shakur v. Schriro*, 514 F.3d 878 (9th Cir. 2008) ............................................................ 10

*Sarviss v. General Dynamics Information Tech.*, 663 F.Supp.2d 883 (C.D. Cal., 2009) ............. 18

*Valley Bank of Nevada v. Plus System, Inc.*, 914 F.2d 1186 (9th Cir. 1990) ........................... 16, 17

### STATE CASES

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal.4th 163 (1999) ......... 18, 19, 20

*Cortez v. Purolator Air Filtration Products Co.*, 23 Cal.4th 163 (2000) ...................................... 18

*Diamond Multimedia Systems, Inc. v. Superior Court*, 19 Cal.4th 1036 (1999) ........................... 16

*Ferguson v. Friendfinders, Inc.*, 94 Cal.App.4th 1255 (2002) ...................................................... 17

*Forest E. Olson, Inc. v. Superior Court*, 63 Cal.App.3d 188 (1976) ............................................. 21

*Hurtado v. Superior Court*, 11 Cal.3d 574 (1974) ............................................................. 15, 23, 24

*In re Tobacco II Cases*, 46 Cal.4th 298 (2009) ......................................................................... 18, 19

*Kearney v. Salomon Smith Barney, Inc.*, 39 Cal.4th 95 (2006) ........................ 2, 21, 22, 23, 24, 25

*Las Palmas Assoc. v. Las Palmas Center Assoc.*, 235 Cal.App.3d 1220 (1991) .......................... 11

*Motors, Inc. v. Times Mirror Co.*, 102 Cal.App.3d 735 (1980) .................................................... 19

*Nelson v. Pearson Ford*, 186 Cal.App.4th 983 (2010) .................................................................. 18

*Norwest Mortgage, Inc. v. Superior Court*, 72 Cal.App.4th 214 (1999) ...................................... 14

*Pan Pacific Sash & Door v. Greendale Park, Inc.*, 166 Cal.App.2d 652 (1958) ......................... 12

*People v. Bestline Products, Inc.*, 61 Cal.App.3rd 879 (1976) ..................................................... 13

*People v. Duz-Mor Diagnostic Lab., Inc.*, 68 Cal.App.4th 654 (1998) ......................................... 19

*People v. Robles*, 23 Cal.4th 1106 (2000) ..................................................................................... 23

*People v. Toomey*, 157 Cal.App.3rd 1 (1985) ................................................................................ 13

*People ex rel. Brown v. PuriTec*, 153 Cal.App.4th 1524 (2007) ................................................... 17

*People ex rel. Kennedy v. Beaumont Investement, Ltd.*, 11 Cal.App.4th 102 (2003) .................... 13

*RLH Industries v. SBC*, 133 Cal.App.4th 1277 (2005) ........................................................... 10, 17

*Schulz v. Neovi Data Corp.*, 152 Cal.App.4th 86 (2007) .............................................................. 13

1

## TABLE OF AUTHORITIES

2

Page

3

## STATE CASES (CONT'D)

4

*Shulman v. Group W Productions*, 18 Cal.4[th] 200 (1998) ............................................................ 21

5

*Yu v. Signet Bank/Virginia*, 69 Cal.App.4[th] 1377 (1999) ............................................................. 14

6

## FEDERAL RULES AND STATUTES

7

47 United States Code

8

Section 153 ............................................................................................................................... 7

9

Federal Rules of Civil Procedure

10

Rule 56 ................................................................................................................................. 9, 25

11

## STATE RULES AND STATUTES

12

California Business and Professions Code

13

Section 17200, *et seq.* .......................................................................................................... 12
Section 17200 ......................................................................................................................... 18

14

California Corporations Code

15

Section 150 ............................................................................................................................... 7

16

Section 25400 ......................................................................................................................... 16
Section 25500 ......................................................................................................................... 16

17

California Penal Code

18

Section 632 ..................................................................................................................... *passim*

19

20

21

22

23

24

25

26

27

28

1    Plaintiffs Vlastimil Sajfr and David Keeports ("Plaintiffs") hereby oppose the Motion For
2  Summary Judgment filed by Defendant BBG Communications, Inc. ("BBG") [Dkt. No. 45].

3  I.    INTRODUCTION AND SUMMARY OF ARGUMENT

4         Without the prior benefit of any discovery, Defendant BBG filed a motion for summary
5  judgment that is largely a rehash of the legal arguments already made to and rejected by Judge
6  Huff in her March 15, 2011 Order denying motions to dismiss (Dkt. No. 35). The fact that this
7  Motion is supported by many of the same Declarations previously submitted in connection with
8  that motion to dismiss does not make the motion fare any better. Plaintiffs' response to these
9  statements is set forth in their Objections to Evidence and Response to Statement of Undisputed
10  Facts and Counterstatement of Additional Facts, which are incorporated by reference herein and
11  are being filed herewith.

12         As to its claim that BBG is not the correct party, but rather the responsible party is BBG
13  Global AG, the limited evidence adduced so far shows that both companies are jointly
14  responsible for the conduct at issue in the Complaint (Dkt. No. 1). First, as the class includes
15  both domestic and international calls, and BBG claims it is responsible for handling domestic
16  calls, its arguments as to not being the responsible party cannot dispose of all of the claims
17  asserted against it in the Complaint. Second, the limited evidence adduced so far and set forth in
18  detail below and submitted with this Opposition show there are disputed material facts whether
19  and to what extent these two companies are inextricably intertwined in their ownership, officers,
20  directors, employees and operations such that they are properly both named as defendants under
21  an alter ego theory. However, BBG's liability is not predicated solely on an alter ego theory, as
22  it attempts to assert. As BBG is responsible for virtually all aspects of the calling process, from
23  selecting the provider that connects the calls worldwide to making the calculations of the
24  amounts to charge for such calls, paying agents using BBG Global AG's bank account in
25  California, billing international calls through its wholly-owned subsidiary, and processing refund
26  requests, BBG can also be liable either under an affiliate, agent, co-conspirator or aider and
27  abettor theory of liability -- none of which it challenges, even though such claims are asserted in
28  ¶¶4, 12-13 of the present Complaint, and are further set forth in detail in the proposed First

1   Amended Complaint.

2      In addition, referencing largely the same materials submitted before to the Court, BBG
3   takes the position that the confidential telephone calls by consumers who complained about the
4   outrageous charges that are the subject of this action are governed by Mexican law -- even
5   though such calls were made to either 619 or domestic 1-800 telephone numbers, and even
6   though at least one of the BBG representatives (who it now disavows works for it) indicated they
7   were in California.  *See* Declarations of David Keeports, Irina Keeports and Vlastimil Sajfr,
8   submitted herewith.  Despite the fact that Judge Huff, citing *Kearney v. Salomon Smith Barney*,
9   39 Cal.4[th] 95 (2006), previously ruled that such claims were *not* governed by Mexican law, BBG
10  simply repeats the same arguments.  To the extent this decision can be reconsidered (BBG does
11  not satisfy the standard for the Court to do so), the Declarations submitted by Plaintiffs show
12  there are disputed material facts as to the application of Penal Code §632 based on calls they
13  each made from California where confidential credit card information was admittedly
14  immediately requested and disclosed. They also each detail how they were never told and had no
15  reason to believe their calls were transferred to and recorded in Mexico.  Lacking from BBG's
16  Declaration from Vania Monge (Dkt. No. 45-10) is any assertion that these calls were not
17  recorded, or were not recorded in San Diego.  Where the calls were recorded, however, is
18  irrelevant under *Kearney*.  To argue to the contrary would create a huge unintended loophole
19  under the law by permitting any company to avoid liability by simply outsourcing such calls
20  overseas -- or just a few miles south of the border in Tijuana.  Moreover, the limited facts
21  adduced so far show that BBG and its affiliates B-Tel and G-Tel are in fact just another strand in
22  the web of affiliated companies owned and operated by the Galicot family, thus making it appear
23  that this scheme was intended primarily to avoid the application of Penal Code §632 by
24  transferring such calls over the border.  *See* Ex. 21 to the Declaration of Alan M. Mansfield in
25  Opposition to Motion for Summary Judgment ("Mansfield Decl.").[1]

26

27  [1] Citations to deposition transcripts and a document presently labeled confidential are submitted
    in a separate Declaration of Alan M. Mansfield to be lodged under seal, and a separate joint
28  motion requesting such documents be filed under seal is being submitted herewith.  Once BBG's

1        Thus for the reasons detailed below, if the Court applies the proper standards for this
2   motion and the relevant law that applies to these claims, this Motion must be denied.
3   Alternatively, based on BBG's failure to comply with its discovery obligations, the Motion
4   should be either denied or continued to permit Plaintiffs to obtain evidence in the face of the
5   stonewalling efforts of BBG in discovery to date.

6   II.    SUMMARY OF DISPUTED MATERIAL FACTS

7        This action is brought as a class action against BBG on behalf of all persons in the United
8   States who, since November 2006, used a credit or debit card to pay for a telephone call from a
9   payphone where either BBG or its affiliates provided the telephone connection service, with the
10  call originating either domestically or overseas.  Complaint, ¶14.  The Complaint alleges that
11  BBG and its affiliates uniformly advertised low fees for domestic and international calls to the
12  United States from payphones at airports, train stations and subway stations located in the United
13  States and around the world, but either misrepresented or did not disclose the significant
14  disparity between calls made with coins and those made with credit cards -- averaging $25.00,
15  whether or not the calls were actually connected.  Exemplars of both foreign and domestic
16  payphone artwork and advertisements prominently featuring the BBG logo are attached to the
17  Complaint as Ex. 1 and as Ex. 4 to the Mansfield Decl.  BBG charged undisclosed and
18  unconscionable fees in connection with those calls by blocking consumers from using reasonably
19  available alternative calling methods, then charging different rates based on the credit card used
20  that were even inconsistent with BBG Global AG's own pricing charts, making it difficult if not
21  impossible to readily determine what the relevant fees were.  *See* Sajfr Decl. at ¶3; Irina Keeports
22  Decl. at ¶3; Mansfield Decl. ¶9; Complaint, ¶¶ 2, 3, 26, 29, 35.

23       Plaintiffs dispute BBG's claim that the rates for such calls can be determined with the
24  push of a button, as asserted in the Frederick Von Klocke Declaration (Dkt. No. 45-3).  While

25

26  counsel has had an opportunity to review this submission, the parties will advise the Court
    whether some or all of this material may be unsealed.  An unredacted copy of the brief will also
27  be filed with the Court.  In addition, while the Court previously dismissed David Keeports as a
    named plaintiff for the non-recording claims, the Declaration from Irina Keeports is relevant to
28  corroborate the statements made by Mr. Sajfr, and as an absent class member.

1  Mr. Von Klocke attempts to explain how the BBG operator call system is supposed to work,
2  Mr. Sajfr and Ms. Keeports explain that is not how the system operated, as well as detail what
3  disclosures that exist stated, as well as what material facts were hidden from consumers.  *See*
4  Sajfr Decl. at ¶3-5; Irina Keeports Decl. at ¶3, 4, 7, 8.  Critically, even if disclosed, the rates
5  actually charged by BBG are substantially inconsistent with internal call records and rate charts
6  contained on BBG Global AG's own website for calls from Frankfurt, Germany.  Mansfield
7  Decl., ¶9, Exs. 5 and 22.  Thus even if such rates were fully and adequately disclosed (which
8  plaintiffs dispute), that does not preclude an unconscionability determination.

9     In its Motion BBG claims these are operator-assisted calls.  In fact, however, an operator
10 is not involved in making these calls.  This is an automated process.  All calls where either BBG
11 or BBG Global AG is the alleged service provider, whether foreign or domestic, are
12 automatically routed through a server located in Longview, Texas.  ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄
13 ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄
14 ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄  *Id.*, Exs. 21 and 22.  While BBG claims consumers can determine
15 the rates to be charged simply by pressing a button for an operator, in fact the corporate designee
16 of NOS and Centris Information Services, the Texas companies that provide such operator
17 services, testified that ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄
18 ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄
19 ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄
20 ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄  *Id.* at Exs. 20
21 and 22 (Emphasis in original).  ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄ ▄▄e
22 ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄
23 ▄▄▄▄▄▄  *Id.*  The more likely reason is that BBG may charge over $172.00 for 7 minutes'
24 worth of calls, or $55.00 for a one to two minute call.  *See* Irina Keeports Decl., Ex. 1; Sajfr
25 Decl., Ex. 1.  In addition to the photos attached as Ex. 1 to the Complaint, even the photographs
26 attached to the Von Klocke Decl. (Dkt. No. 45-3) show that nowhere on the phone is there any
27 disclosure of any minimum connection times, fees or costs disclosed for making such calls, even
28 though the phones prominently state a coin operated call only costs a couple Euros, or less than

1  $4.00. A consumer would have no reason to believe using a credit or debit card would increase
2  this amount by 10-fold. Such lack of disclosure is consistent with other BBG signage in Europe,
3  all of which fail to give consumers any rate information. *See* Mansfield Decl., Ex. 5. Such
4  charges were not affirmatively disclosed by BBG's operators at any time during the telephone
5  call process, such as typically occurs when a consumer uses a coin operated pay phone or speaks
6  with an operator. Sajfr Decl. at ¶3; Irina Keeports Decl. at ¶3. Rather, as stated above, the
7  process is entirely automated or operators are instructed not to provide such information unless
8  they are specifically and directly asked for it.

9  In addition, nowhere on the signs submitted by Mr. Von Klocke from the Frankfurt
10 airport does BBG Global AG's name appear as the service provider. In fact, on payphones
11 throughout Europe, either the BBG logo or BBG Communications Inc. is listed as the name that
12 appears as providing such service. Mansfield Decl., Ex. 5. This is consistent with what BBG
13 publicly represents, where it claims on its website that "BBG Communications, Inc. is an
14 industry leader in Operator Assisted Services. . . . BBG has interconnect and billing
15 arrangements that enable it to *directly carry and deliver telecommunications traffic and bill*
16 *customers in Canada, Germany, Japan, UK and US and in every other country with credit card*
17 *transactions.*" (Keeports Decl., Exs. 1 and 2 (emphasis added)); and in its Privacy Policy that
18 "BBG provides international telecommunications services, including public telephony, calling
19 card, long distance operator assistance, credit card processing, billing, collection and wireless
20 telecommunications services. BBG processes casual-use voice services from European Union
21 ("EU") or Swiss telephone users making long distance calls from payphones or hotels".
22 Mansfield Decl., Ex. 6. Thus, it is a jury question whether to believe the statements on BBG's
23 own websites and privacy policies, made with no litigation pending, or its contrary self-serving
24 statements designed to avoid BBG's potential multi-million dollar liability.

25 There are also significant disputed facts whether, no matter who was the actual service
26 provider, whether the conduct and scheme at issue ultimately was created, supported by and
27 conducted in active concert with BBG and the Galicot family based in and emanating from
28 California. BBG's principal place of business is in San Diego, and key officers and management

1  personnel are located here, including its president, vice president and only Board members
2  Gregorio and Raphael Galicot. Mansfield Decl., Ex. 7, 11 and 21. While in its Motion BBG
3  claims Gregorio Galicot is not the president of BBG Global AG but only a director (actually,
4  Chairman of the Board), in filings with the Federal Communications Commission, BBG Global
5  AG states Mr. Galicot is its president and that BBG Global AG is not a foreign carrier.
6  Mansfield Decl., Ex. 8 at 6-7. Both companies are owned by the same Galicot family trusts, with
7  the trustee Gregorio Galicot's brother-in-law. *Id.*, Ex. 7. Both companies operate using bank
8  accounts at Wells Fargo Bank in San Diego. *Id.*, Ex. 7. While BBG claims BBG Global AG has
9  no employees in California, its former general counsel who signed the 2007 letter indicating
10 BBG Global AG was succeeding BBG Holdings' contract with NOS and other employees
11 independently state they have worked for BBG Global in San Diego. *Id.*, Exs. 9 and 10. Pilar
12 Urbino Morales, the former "managing director" of BBG Global AG who signed agreements
13 between BBG and BBG Global AG on behalf of that company in 2006 and Board meeting
14 minutes that were submitted by BBG in support of its motion, also was not based in Switzerland
15 ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ *Id.*, Ex. 21.

16      Call routing for all calls is conducted through the same servers operated by the same
17 company, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
18 ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ *Id.*, Ex.
19 22. All call billing is actually performed by BBG here. It then sends the customer billing for
20 international calls for processing through its wholly-owned subsidiary in Luxembourg, BBG
21 Financial Services s.a.r.l., in which Raphael and Gregorio Galicot are officers. *Id.*, Exs. 6, 7, 11
22 and 13. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
23 ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
24 ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ *Id.*, Exs. 19, 21 and 23. Even BBG's privacy
25 policy, and BBG and BBG Global AG's (or its subsidiary's and predecessor's BBG Holdings')
26 agreements between themselves and their agents apply California law and/or select the forum for
27 resolving any disputes between them as being San Diego, California. *Id.*, Exs. 6, 7, 11 and 12.
28 This is significant because, according to Ms. Fedier in her Declaration, such provisions are

1  present because this was where the services are to be performed. Fedier Decl., ¶9. In addition,
2  according to Bryan Rhys, at least some of the advertising material and artworks for payphones is
3  created by BBG. Rhys Decl., ¶9.

4  These same companies also use the same computer servers in Texas to process calls
5  wherever they come from (or use the affiliated company G-Tel's servers). BBG Global claims in
6  its privacy policy to also store data "in our sites located in San Diego, Ca. and Las Vegas". They
7  use the same domain extensions for e-mails and the same toll-free 1-800 numbers for consumers
8  to contact them. Mansfield Decl., Exs. 7, 11, 14-16, 22. They both use the same call center
9  operators who receive instructions on how to answer customer inquiries from BBG, the same
10 website address extensions for contact information and to use in their business operations, the
11 same training manual, the same logos, the same customer dispute domestic 1-800 numbers and
12 the same dispute call center personnel. *Id.* Thus, in reality there is no facially functional
13 distinction made between them other than the amount billed between domestic and international
14 calls. Even when bills are sent to consumers, they do not refer to BBG Global AG but rather an
15 undefined entity called BBG Germany or German Telecom that even BBG was unable to
16 identify, even though it makes the billing arrangements. *See Id.* Ex. 7; Keeports Decl., Ex. 1;
17 Sajfr Decl. Ex.1.

18 Based on the record evidence available a consumer would be hard pressed to ever know
19 precisely what BBG entity it may actually be dealing with based on such billing statements, since
20 BBG Global AG's name appears nowhere at all during the entire consumer transaction process --
21 from advertising to dialing to billing. BBG in its Motion provides no evidence showing that a
22 customer would have any reason to know it was not dealing with BBG, based on the publicly
23 available information.

24 In addition, both BBG and BBG Global AG in their privacy policies state they collect and
25 only share billing information with their "affiliates", which by definition under both California
26 and federal telecommunications law includes companies under common control with each other.
27 Mansfield Decl., Exs. 6 and 14. *See* Cal. Corp. Code §150; 47 U.S.C. §153(l). There can be no
28 dispute these companies are under common ownership and control. This is particularly relevant

1   as to BBG, since in its privacy policy it talks about obtaining information for calls made from
2   Europe -- an odd statement to make if it is not involved in the European call process. *Id.* at Ex.
3   6. Moreover, if such data is shared with its customer call complaint centers, under such policies
4   those companies must be affiliates as well. As they both claim to be gathering confidential
5   billing information under those policies, and BBG is the entity that actually engages in the
6   consumer billing process, to be consistent with those policies BBG would need to be affiliated,
7   *i.e.*, under common control, with BBG Global AG. By virtue of their operating agreements, at a
8   minimum BBG would be actively participating and engaging in such conduct as an agent of
9   BBG Global AG. Finally, contrary to the assertions by Ms. Fedier, the "worldwide
10   headquarters" of BBG Global AG in Switzerland appear to at best be sparse, not always open on
11   business days, has the wrong company name on its mailbox, and only identifiable by a sign taped
12   to the door. Mansfield Decl., ¶¶2-7 and Exs. 1-3. BBG's San Diego operations are 10 times the
13   size in terms of space, and potentially personnel as well. BBG's argument that the services in
14   question are "wholly foreign" transactions provided by some company other than BBG is
15   contradicted by the facts available so far, which drawing all inferences in Plaintiffs' favor show
16   that both companies' operations effectively take place out of San Diego.

17        There are numerous disputed issues of material fact whether the "services" in question --
18   which from the consumers' perspective stretch from advertising at the payphone, connecting the
19   call, rating the call, billing the call and customer service-- are at a minimum conducted in concert
20   under agreements between BBG Global AG and BBG. In fact, the inter-company agreement
21   submitted to the Court appears to indicate that this is a concerted, highly intertwined effort where
22   BBG actually performs almost all the work, from pricing to arranging for the interconnection
23   arrangements to billing. Finally, as to calls that originate in the United States, which is part of
24   the class definition, BBG claims it is the responsible entity for such calls from beginning to end
25   and is at least partially responsible for setting the rates for such calls that are billed to consumers.
26   Mansfield Decl., Ex. 7.

27        BBG admits it has received over a thousand calls from consumers complaining about
28   similar charges, which has resulted in an "F" rating for BBG from the San Diego Better Business

1   Bureau. Mansfield Decl., Exs. 15, 17 and 21. While BBG asserts these customers should know

2   they are in contact with a call center located in Tijuana operated by B-Tel or G-Tel (▮▮▮▮▮

3   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4   ▮▮▮▮▮▮▮▮▮, *Id.*, Exs. 7, 18 and 21), the disputed facts submitted in both the Sajfr Decl. at

5   ¶6-7, the Irina Keeports Decl. at ¶9 and the Keeports Decl. at ¶8-18 and Exs. 3 and 4 show they

6   uniformly did not first obtain the consent of California consumers to record such conversations

7   and why consumers reasonably believed they were not speaking to anyone in Mexico. *Id.*

8   Instead, based on the information and numbers provided to them they believed they were talking

9   to representatives in the United States or who worked for BBG -- including being provided a 619

10  area code to contact a BBG customer service representative, Alma Perez. While BBG now

11  claims she is not one of its employees, she is listed by the BBB as the customer care specialist

12  for BBG. Mansfield Decl., Exs. 16 and 17. Despite submitting the Declaration of B-Tel's

13  representative, Vania Monge, BBG does not dispute that any of the affiliates who work for BBG

14  (the company in charge of billing and processing credits) surreptitiously record all customer

15  communications, even though its representatives admittedly immediately ask for and must be

16  provided confidential information such as a credit card number at the initiation of every call.

17  Mansfield Decl., Ex. 15. Based on this mountain of disputed and contradictory facts, who is

18  responsible for the conduct at issue cannot be summarily adjudicated.

19  **III.   THE STANDARD ON A SUMMARY JUDGMENT MOTION**

20         Summary judgment is only appropriate where "the pleadings, the discovery and

21  disclosure materials on file, and any affidavits show that there is no genuine issue as to any

22  material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

23  56(c)(2). As the Supreme Court has observed:

24         Of course, a party seeking summary judgment always bears the initial
           responsibility of informing the district court of the basis for its motion, and
25         identifying those portions of "the pleadings, depositions, answers to
           interrogatories, and admissions on file, together with the affidavits, if any," which
26         it believes demonstrate the absence of a genuine issue of material fact.

27  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Brinson v. Linda Rose Joint Venture*, 53

28  F.3d 1044, 1048 (9th Cir. 1995) (non-moving party's required showing arises only *after* the

1  moving party has made its required showing). As shown through the above Statement of
2  Facts and the evidence submitted in Opposition to this Motion, BBG has failed to carry its
3  burden of showing an absence of material fact in terms of BBG being either a direct
4  participant in the wrongdoing, a co-conspirator, an agent, an alter ego participant or an aider
5  and abettor. Simply asserting that a company is not an alter ego, when there are disputed
6  facts that can reasonably lead a trier of fact to a different conclusion, compels denial of a
7  motion for summary judgment. *RLH Industries v. SBC*, 133 Cal.App.4th 1277, 1287 (2005)
8  (Declarations that fail to establish all bases for refuting both agency and alter ego allegations
9  fails to shift the burden of production on such theories to non-moving party, and thus
10 moving party not entitled to summary judgment). As BBG has failed to meet its initial
11 burden on this Motion. Plaintiffs need not submit additional evidence establishing the
12 existence of a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250
13 (1986) (only where the moving party meets its initial burden of production of evidence must
14 the non-moving party set forth facts showing that there is a genuine issue for trial).

15 Nevertheless, Plaintiffs demonstrate above that the pleadings, discovery and
16 disclosure materials on file, along with the declarations submitted herewith, make clear that
17 genuine issues remain as to a number of material facts, precluding summary judgment in
18 BBG's favor. As the Supreme Court noted, the proper inquiry is "whether the evidence
19 presents a sufficient disagreement to require submission to a jury or whether it is so one-
20 sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. Here,
21 if the evidence can be said to be one-sided, at this point it is in Plaintiffs' favor. That is
22 especially true since the Court "is required to draw all inferences in a light most favorable to
23 the non-moving party." *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997) (*overruled
24 on other grounds by Shakur v. Schriro*, 514 F.3d 878 (9th Cir. 2008)).

25 **IV.  WHILE THERE ARE DISPUTED FACTS AS TO PLAINTIFFS' "ALTER
26      EGO" ALLEGATIONS THAT PRECLUDE SUMMARY JUDGMENT, THAT IS
        NOT THE SOLE BASIS UPON WHICH BBG COMMUNICATIONS IS NAMED
27      AS A DEFENDANT**

28      As a threshold matter, the class as defined in the Complaint includes both consumers who

1  made domestic calls and international calls. Since the Motion only addresses international calls,
2  it cannot dispose of the entire action or the claims of all class members, since BBG admittedly
3  handles all domestic calls. On this basis alone, the Motion should be denied.

4         However, even if the Court moves to the merits of the Motion, BBG still should not
5  prevail based on the disputed facts detailed above. In *Las Palmas Assoc. v. Las Palmas Center*
6  *Assoc.*, 235 Cal.App.3d 1220, 1248-50 (1991), the Court stated that there is not a hard and fast
7  bright line rule for determining alter ego liability as BBG would have the Court believe, but
8  rather that it is dependent on the particular facts and circumstances of the case. The Court there
9  affirmed the finding of alter ego liability between companies that were the subject of common
10 and related ownership and overlapping directors and officers, where "it would be as equally
11 unfair to permit Hahn Inc. to escape liability for the unperformed guaranties simply because it
12 earlier had transferred ownership of Devcorp to, among others, a sister corporation within the
13 Trizec family of companies." Where two sister corporations were concerned, an asserted claim
14 of corporate separateness was not enough to avoid a finding of alter ego liability:

15     "Generally, alter ego liability is reserved for the parent-subsidiary relationship.
16 However, under the single-enterprise rule, liability can be found between sister
companies. The theory has been described as follows: 'In effect what happens is
17 that the court, for sufficient reason, has determined that though there are two or
more personalities, there is but one enterprise; and that this enterprise has been so
18 handled that it should respond, as a whole, for the debts of certain component
elements of it. The court thus has constructed for purposes of imposing liability
19 an entity unknown to any secretary of state comprising assets and liabilities of
two or more legal personalities; endowed that entity with the assets of both, and
20 charged it with the liabilities of one or both.'"

21 *Id.* at 1249-50 (citations omitted). The Court concluded that alter ego liability can be found
22 where "it would be unjust to permit those who control companies to treat them as a single or
23 unitary enterprise and then assert their corporate separateness in order to commit frauds and
24 other misdeeds with impunity." *Id.*

25        The disputed and undisputed facts as set forth above detail the existence of such a single
26 enterprise or scheme, or that at a minimum there are numerous disputed materials facts that,
27 making all inferences in favor of plaintiffs, establish this is an issue for fuller development at
28 trial. As explained above, nowhere in the transaction process would any consumer be able to

1  determine the existence of BBG Global AG, let alone that it was the responsible party. There is
2  an undisputed unity of ownership as both companies are owned by the same family trusts located
3  in San Diego, with the trustee for both companies being the brother-in-law of the president of
4  BBG and at a minimum the Chairman, if not the president, of BBG Global AG. Both share
5  similar officers or directors. Both have key employees that claim to work or have worked for
6  both companies. Both use the same corporate name and logo in advertising. Both are admitted
7  affiliates of each other. BBG claims on its own website to directly provide the services provided
8  by BBG Global AG, both domestically and internationally. Both use the same servers in Texas
9  and California, as well as the same telephone numbers, email addresses, banking arrangements,
10 call centers and service and billing platforms. Both profit from the unconscionable fees charged
11 consumers. Whether they are ultimately found to be alter egos of each other is for the jury to
12 decide, not based on a premature motion for summary judgment while significant discovery is
13 still outstanding and has yet to be completed (see discussion *infra*).

14       Thus, based on the disputed material facts adduced so far, it appears:

15       ". . . each corporation was but an instrumentality or conduit of the other in the
         prosecution of a single venture. . . . There was such unity of interest and
16       ownership that the separateness of the two corporations had in effect ceased and
         an adherence to the fiction of a separate existence of the two corporations would,
17       under the circumstances here present, promote injustice and make it inequitable
         for Greendale to escape liability for an obligation incurred as much for its benefit
18       as for Ralmor."

19 *Pan Pacific Sash & Door v. Greendale Park, Inc.* 166 Cal.App.2d 652, 658-59 (1958).

20       However, even a finding that there is not alter ego liability would not justify granting
21 BBG's Motion. Under Cal. Bus. & Prof. Code §17200, *et seq.* ("UCL"), a party can also be held
22 liable for the acts of another based on various theories, such as aiding and abetting, agency and
23 conspiracy. As the above evidence shows, BBG actively and personally participated and was
24 deeply involved in orchestrating the scheme at issue as a result of its extensive relationships with
25 BBG Global AG and entering into and approving the offending contracts, having knowledge of
26 the underlying conduct through its common ownership, officers and directors, and the ability to
27 influence such conduct. In addition, by giving substantial assistance and encouragement to this
28 scheme through its common ownership, officers and directors, as well as being directly

1  responsible for misbilling consumers, cooperating with each other and receiving substantial
2  compensation as a result of that conduct, BBG had a direct stake in the success of this scheme.
3  Under such facts, as the controlling Galicot family appears to be the moving force behind the
4  entire scheme, BBG can also be held liable under an aiding and abetting theory. *People v.*
5  *Toomey,* 157 Cal.App.3d 1, 15-16 (1985); *Schulz v. Neovi Data Corp.,* 152 Cal.App.4th 86, 95-
6  96 (2007); *People v. Bestline Products, Inc.,* 61 Cal.App.3d 879, 918 (1976).

7          To the extent BBG acted as an affiliate and agent of BBG Global AG as evidenced by
8  licensing the use of its logo and name, actively participating in processing payments and utilizing
9  its billing system and receiving payments based on the success of that activity, it can also be held
10 liable for the acts in question. *Id.* Finally, as a result of entering into agreements with BBG
11 Global AG, it planned, participated and furthered a common plan or scheme of deception and
12 furnished the means for the accomplishment of the underlying wrongdoing of misbilling and
13 overcharging unconscionable fees on consumers. Based on its knowledge of such wrongfulness
14 through its officer and directors, BBG can also be held liable under a conspiracy theory, no
15 matter who actually performed the wrongful acts. *Bestline Products, supra,* 61 Cal.App.3d at
16 918-19; *People ex rel. Kennedy v. Beaumont Investement, Ltd.,* 11 Cal.App.4th 102, 136-38
17 (2003). As BBG fails to address any of these separate and independent bases upon which
18 liability against it may be established, its Motion must be denied.

19 **V.      PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE PRESUMPTION
          AGAINST EXTRATERRITORIALITY**
20

21         Even assuming that the conduct alleged by Plaintiffs occurred entirely overseas, which is
22 not the case as detailed herein and in the evidence adduced so far, BBG's argument that
23 Plaintiffs' claims should be barred by the presumption against extraterritoriality because
24 Plaintiffs have asked the court to apply California common law and consumer protection statutes
25 extraterritorially to conduct occurring beyond the borders of the United States is misplaced.
26 "Numerous cases have applied the law of a jurisdiction other than the situs of the injury where
27 there existed some other link between that jurisdiction and the occurrence." *Allstate Ins. Co v.*
28 *Hague,* 449 U.S. 302, 315 (1981). *See, also, Cardillo v. Liberty Mutual Ins.* Co., 330 U.S. 469

1 (1947); *Alaska Packers Assn. v. Industrial Accident Comm'n*, 294 U.S. 532 (1935); *Rosenthal v.*
2 *Warren*, 475 F.2d 438 (2d. Cir. 1973), cert. denied, 414 U.S. 856 (1973).

3        Moreover, it is well-established that courts may apply various laws and statutes to
4 conduct that has occurred beyond the borders of the United States. *See, e.g., Pakootas v. Teck*
5 *Cominco Metals, Ltd.*, 452 F.3d 1066, 1071 (9th Cir. 2006) (the court applied the Comprehensive
6 Environmental Response, Compensation, and Liability Act to conduct that occurred in Canada
7 because the "failure to extend the scope of the statute to a foreign setting will result in adverse
8 effects within the United States"); *H.K. & Shanghai Banking Corp. v. Simon (in Re Simon)*, 153
9 F.3d 991, 996 (9th Cir. 1998) (a court may apply a law to conduct occurring outside the United
10 States where "the regulated conduct is intended to, and results in, substantial effects within the
11 United States") (internal quotations omitted); *Environmental Defense Fund v. Massey*, 986 F.2d
12 528, 531 (D.D.C. 1993) (a court may apply a law to conduct occurring outside the United States
13 "where the failure to extend the scope of the statute to a foreign setting will result in adverse
14 effects within the United States").

15        Further, California courts have stated that California state laws, including claims alleged
16 by Plaintiffs, presumptively apply extraterritorially in cases where the plaintiff is a resident of
17 California, such as the case here. *See, e.g., Norwest Mortgage, Inc. v. Superior Court*, 72
18 Cal.App.4th 214, 222 (1999) (allowed UCL to apply to claims by "California residents
19 regardless of where the Norwest Mortgage's conduct of purchasing FPI occurred"); *Yu v. Signet*
20 *Bank/Virginia*, 69 Cal.App.4th 1377, 1391 (1999) (court allowed a claim under the UCL by a
21 California resident who was allegedly harmed by out-of-state misconduct). In addition, the
22 evidence adduced so far shows that every telephone call in question, whether domestic or
23 international, touched the United States -- even if that call was from Frankfurt, Germany to the
24 Czech Republic -- by being routed through switches in the United States and being rated and
25 billed from San Diego. BBG's argument that the Court does not have subject matter jurisdiction
26 because the conduct occurred beyond the borders of the United States should be rejected.
27 / / /
28 / / /

1    **VI.    THE DOCTRINE OF INTERNATIONAL COMITY DOES NOT MANDATE DISMISSAL OF PLAINTIFFS' CLAIMS**

2

3    BBG's next argument that principles of comity mandate dismissal of Plaintiffs'
4 complaint is similarly flawed. "Comity is 'the recognition which one nation allows within its
5 territory to the legislative, executive or judicial acts of another nation, having due regard both to
6 international duty and convenience.'" *Dependable Highway Express, Inc. v. Navigators Ins. Co.,*
7 498 F.3d 1059, 1067 (9th Cir. 2007) (quoting *Hilton v. Gilot,* 159 U.S. 113, 164 (1895)).
8 Extension of comity is not "a matter of absolute obligation." *Id.* Here, Plaintiffs are residents of
9 California, BBG is headquartered in California, is owned by California residents, and as stated
10 above the conduct in question primarily occurred in California. As such, principles of comity do
11 not apply in this case and California is the proper location to litigate such claims.

12    **VII.    CHOICE OF LAW ISSUES DO NOT WARRANT DISMISSAL OF PLAINTIFFS' CLAIMS AGAINST BBG**

13

14    California courts follow the rule requiring an analysis of the respective interests of the
15 states involved (the "governmental interest" approach), the objective of which is "to determine
16 the law that most appropriately applies to the issue involved." *Hurtado v. Superior Court,* 11
17 Cal.3d 574, 579 (1974). Moreover, when laws of more than one venue are implicated, then
18 "clearly the law of the interested state should be applied." *Id.* at 580. Here, California is the
19 interested state as Plaintiffs are residents of California, BBG is headquartered in California and
20 many of its officers, directors and owners are here. Indeed, in several relevant agreements, BBG
21 and BBG Global AG assert that relevant claims arising out of their conduct or that of their agents
22 are to be brought in California under California law. Mansfield Decl., Exs. 6, 7, 11, and 12.

23    Significant for purposes of this Motion, BBG does not argue that BBG Global AG is not
24 its affiliate. Indeed, both companies claim to have such an affiliated relationship in their privacy
25 policies by virtue of sharing personal consumer data. Both companies are owned by the same
26 family trusts, operate in concert with each other and have overlapping officers. Under both
27 California law and federal telecommunications law cited above, such facts establish they are
28 affiliates. Thus, based on being controlled in California by California residents, both companies

1  are subject to California law, as they have agreed in other relevant contractual arrangements.

2  **VIII.  PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE "DORMANT**
3  **COMMERCE CLAUSE"**

4  "Not every exercise of state power with some impact on interstate commerce is invalid."
5  *Edgar v. MITE Corp.* (1982) 457 U.S. 624, 640.  State economic regulation that operates
6  evenhandedly, advances legitimate state interests, and has only an indirect or incidental effect on
7  interstate commerce is constitutionally permissible "'unless the burden imposed on such
8  commerce is clearly excessive in relation to the putative local benefits.'"  *Id.*, quoting *Pike v.*
9  *Bruce Church, Inc.* 397 U.S. 137, 142 (1970).  Only state regulation that directly regulates or
10 discriminates against interstate commerce is strictly prohibited.  *Valley Bank of Nevada v. Plus*
11 *System, Inc.* 914 F.2d 1186, 1189 (9th Cir. 1990), citing *Brown-Forman Distillers Corp. v. New*
12 *York State Liquor Authority* (1986) 476 U.S. 573, 579.  The party making the constitutional
13 challenge has the burden of demonstrating the impact of the state regulation on interstate or
14 foreign commerce.  See *Hughes v. Oklahoma* (1979) 441 U.S. 322, 336.

15  For example, in *Diamond Multimedia Systems, Inc. v. Superior Court*, 19 Cal.4th 1036,
16 1065 (1999), the California Supreme Court held that out-of-state purchasers and sellers of
17 securities impacted by unlawful market manipulation proscribed under Corporations Code
18 §25400 may seek damages afforded by Corporations Code §25500 even where the transaction
19 occurred outside of California.  The Court was not persuaded by arguments that allowing non-
20 residents to recover damages for wrongful conduct (in that case, improper market manipulation)
21 occurring in this state would burden interstate commerce:

22      Amici curiae fail to explain how permitting persons who purchase or sell stock at
        a time when the market price is affected by market manipulation occurring in
23      California to recover damages from the California malefactor burdens interstate
        commerce. . . . Quite the opposite.  By affording a remedy to persons who are the
24      victims of manipulative conduct, section 25500 stimulates commerce in corporate
        stock. *Id.* at 1063.
25

26  BBG's Commerce Clause argument rests on the false factual premise that a court's order
27 necessarily regulates conduct occurring wholly outside California.  Here, as in *Diamond*, the
28 disputed facts detailed above raise significant questions over that issue.

1     *Valley Bank of Nevada v. Plus System, Inc.*, *supra*, 914 F.2d at 1197, is instructive.
2 There, the defendant challenged on Commerce Clause grounds a Nevada statute that allows
3 Nevada banks to charge a fee for the use of their ATM machines by persons who do not have
4 accounts at those banks. The Ninth Circuit upheld the constitutionality of the Nevada statute. In
5 doing so it rejected BBG's "uniformity" argument, pointing out that, "[a]t the extreme, this
6 argument would mean that a state could make no rules to which commercial contracts with non-
7 state-resident parties must conform." *Id.* at 1190. "[T]he Commerce Clause protects against
8 inconsistent legislation arising from the projection of one state regulatory regime into the
9 jurisdiction of another State." *Healy v. Beer Inst., Inc.*, 491 U.S. 324 at 336-337 (1989).

10     BBG also fails to undertake the required analysis to determine whether the dormant
11 Commerce Clause is implicated in this action. *See, Ferguson v. Friendfinders, Inc.*, 94 Cal.App.
12 4th 1255, 1261-63 (2002)((1) does the ordinance discriminate in favor of local businesses, or
13 directly regulate or control interstate commerce; and (2) is the burden clearly excessive in
14 relation to the putative local benefits). BBG does not specify which laws are subject to the
15 dormant Commerce Clause, or how they discriminate in favor of California businesses. Indeed,
16 BBG does not and cannot argue that a California consumer protection law that prevents
17 deceptive practices by California-based businesses favors California businesses over other
18 businesses. The relevant laws "apply equally to in-state and out-of-state actors." *People ex rel.*
19 *Brown v. PuriTec*, 153 Cal.App.4th 1524, 1531 (2007); *Ferguson*, 94 Cal.App.4th at 1269
20 ("truthfulness in advertising . . . does not burden interstate commerce at all 'but actually
21 "facilitates it by eliminating fraud and deception . . .'"; "nor do the statute's affirmative
22 disclosure requirements impose any appreciable burden") (citations omitted). Because
23 California has an interest in regulating businesses that operate within its borders, as is the case
24 here, the dormant Commerce Clause is inapplicable, and the application of California law to non-
25 residents is constitutional. *Church v. Consol. Freightways*, C-90-2290 DLJ, 1992 WL 370829 at
26 *6 (N.D. Cal. Sept. 14, 1992) ("California has an interest in addressing the alleged fraudulent
27 conduct of its residents"). *See also RLH Industries, supra*, 133 Cal.App.4th at 1291-92
28 (rejecting Commerce Clause defense by California-based company where conduct in question

1 || emanated at least in part from here and distinguishing BBG's authorities).

2 The cases BBG cites are inapposite because, unlike here, they concern conduct that
3 || occurred wholly outside the borders of the regulating state. See *e.g.*, *Healy v. Beer Inst., Inc.*,
4 || 491 U.S. at 326 (law required "out-of-state shippers of beer to affirm... posted prices for
5 || products" were the same as prices for in-state products); *Sarviss v. General Dynamics*
6 || *Information Tech.*, 663 F.Supp.2d 883, 900-901(C.D. Cal. 2009) (employment case interpreting,
7 || under an extraterritoriality analysis, whether California's wage and hour law applied to work
8 || perform "almost entirely outside California" on behalf of a Virginia-based employer); *Nat'l*
9 || *Foreign Trade Council v. Natsios*, 181 F.3d 38, 62 (1st Cir. 1999) *aff'd sub nom. Crosby v. Nat'l*
10 || *Foreign Trade Council*, 530 U.S. 363 (2000)(addressing only whether the "market participant"
11 || exception to the dormant commerce clause applies to the foreign commerce clause); *Experience*
12 || *Hendrix, L.L.C. v. HendrixLicensing.com, LTD*, 766 F.Supp.2d 1122, 1133 (W.D. Wash. 2011)
13 || (holding that choice-of-law directive in Washington statute imposing Washington law without
14 || regard for choice-of-law principles violate dormant commerce clause). Thus, the dormant
15 || Commerce Clause does not justify granting summary judgment in favor of BBG.

16 || **IX. THERE IS NO APPLICABLE "SAFE HARBOR" BAR THAT PRECLUDES PLAINTIFFS' CLAIMS UNDER THE UCL**
17

18 The UCL defines "unfair competition" to include "any unlawful, unfair or fraudulent
19 || business act or practice." Cal. Bus. & Prof. Code § 17200. As there are three independent
20 || categories of practices that constitute unfair competition, plaintiffs need only show one category
21 || of wrong for the claim to survive. *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20
22 || Cal.4th 163, 180 (1999); *Lippitt v. Raymond James Fin. Servs.*, 340 F.3d 1033, 1043 (9th Cir.
23 || 2003), *amended*, No. 01-17049, 2003 U.S. App. LEXIS 19524 (9th Cir. 2003).

24 The UCL imposes strict liability where an act that violates the UCL is established.
25 || *Cortez v. Purolator Air Filtration Products Co.*, 23 Cal.4th 163, 180-181 (2000). The focus of
26 || the UCL is "on the defendant's conduct, rather than the plaintiff's damages, in service of the
27 || statute's larger purpose of protecting the general public against unscrupulous business practices."
28 || *Nelson v. Pearson Ford*, 186 Cal.App.4th 983, 1015 (2010). As the Supreme Court held in *In Re*

1 | *Tobacco II Cases, supra*, 46 Cal.4th at 312:

2 
3 
4 
5 

> The substantive right extended to the public by the UCL is the """right to protection from fraud, deceit, *and unlawful conduct*"""" (*Prata v. Superior Court*, 91 Cal.App.4th 1128, 1137 (2001)), and the focus of the statute is on the defendant's conduct. As we have already observed, the proponents of Proposition 64 told the electorate that the initiative would not alter the statute's fundamental purpose of protecting consumers from unfair businesses practices. (Emphasis added.)

6 | BBG makes no attempt to show that its conduct is not either "unlawful" or "unfair". As

7 | Plaintiffs have shown based on the initial facts available how BBG was actively engaged, either

8 | independently or working on concert with BBG Global AG,  in imposing unconscionable

9 | charges and false advertising, they have properly stated a claim for violation of two of the three

10 | prongs under the UCL that are not challenged. Since BBG's argument cannot dispose of the

11 | entire UCL cause of action, it cannot form a basis for summarily adjudicating the UCL claim.

12 | **X.  PLAINTIFFS PROPERLY SHOW BBG HAS ENGAGED IN "UNFAIR" ACTS AND PRACTICES**

13 

14 | A business practice is "unfair" under the UCL if it "offends an established public policy

15 | *or* when the practice is immoral, unethical, oppressive, unscrupulous *or* substantially injurious to

16 | consumers."  *People v. Duz-Mor Diagnostic Lab., Inc.*, 68 Cal.App.4th 654, 662 (1998)

17 | (citations omitted, emphasis added).  Whether a business practice is "unfair" involves weighing

18 | the utility of the defendant's conduct against the gravity of the harm to the alleged victims.

19 | *Lippitt*, 340 F.3d at 1043; *Motors, Inc. v. Times Mirror Co.*, 102 Cal.App.3d 735, 740 (1980).

20 
21 
22 
23 

> [T]he Legislature . . . intended by this sweeping language to permit tribunals to enjoin on-going wrongful business conduct in whatever context such activity might occur. Indeed . . . the section was intentionally framed in its broad, sweeping language, precisely to enable judicial tribunals to deal with the innumerable " 'new schemes which the fertility of man's invention would contrive.'

24 | *Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co., supra*, 20 Cal.4[th] at 181.

25 | The "safe harbor" exemption upon which BBG relies is improperly construed as

26 | defeating the entire UCL claim, since by definition it only applies to the "unfair" prong of the

27 | UCL. Its argument is also legally wrong. In order to assert such a defense under *Cel-Tech*, there

28 | must be a specific law that protects the misleading conduct in question.  BBG fails to cite any

1 such "safe harbor". All it claims (improperly based on the Holznagel Declaration) is that no

2 specific disclosures are expressly required. That is a critical distinction. As the Supreme Court

3 stated in *Cel Tech, supra*, 20 Cal.4th at 182-83:

4       "The rule does not, however, prohibit an action under the unfair
competition law merely because some other statute on the subject does not, itself,

5 provide for the action or prohibit the challenged conduct. To forestall an action
under the unfair competition law, another provision must actually 'bar' the action

6 or clearly permit the conduct. There is a difference between (1) not making an
activity unlawful, and (2) making that activity lawful. For example, Penal Code

7 §211, which defines robbery, does not make murder unlawful. Most assuredly,
however, that section does not also make murder lawful. Acts that the Legislature

8 has determined to be lawful may not form the basis for an action under the unfair
competition law, but acts may, if otherwise unfair, be challenged under the unfair

9 competition law even if the Legislature failed to proscribe them in some other
provision."

10

11       Since BBG fails to cite to any law that specifically makes all of the conduct at issue

12 immune from suit or specifically expressly permits the conduct at issue, but simply says there is

13 nothing that specifically prohibits it, there is no "safe harbor" exemption as a matter of law. It

14 certainly cannot claim no such exemption exists as to any surreptitious recording practices for

15 which it is responsible, since California law applies for the reasons detailed *infra*.

16 **XI. PLAINTIFFS MAY PROPERLY ASSERT A PENAL CODE SECTION 632
CLAIM NO MATTER WHERE THE CALL CENTER IS LOCATED BASED ON**

17 **THE PRESENCE OF THE SUB-CLASS MEMBERS IN CALIFORNIA**

18       Judge Huff already ruled in her Motion to Dismiss ruling that Defendant's conduct was

19 subject to Penal Code §632. BBG simply asserts the same arguments, citing the Declaration of

20 Vania Monge (Dkt. No. 45-10). Her statements are facially incorrect as she cannot even

21 appropriately verify the year the alleged contract was entered into, suggesting it occurred on a

22 date four years *before* BBG Global AG was founded. Moreover, her assertions contradict the

23 Declarations of Mr. Keeports and Mr. Sajfr. While BBG asserts consumers had no reason to

24 believe they were making calls to California, (1) Mr. Keeports was told to contact BBG at a

25 "619" number, and (2) Mr. Sajfr and Mr. and Mrs. Keeports called a 1-800 number on their bill,

26 which could reasonably be expected as only operating domestically and not internationally. *See*

27 Sajfr Decl., ¶¶6-7, Irina Keeports Decl., ¶9, and Keeports Decl., ¶¶8-18 and Exs. 3 and 4.

28 Whether BBG had the calls routed outside the United States is irrelevant. If that were the law, a

    - 20 -     

1 company could evade Section 632 simply by forwarding calls overseas. There is nothing in
2 either logic or law that suggests that is an appropriate construction of California law, nor
3 anything in the legislative history submitted by BBG (which only addresses monitoring, not
4 recording). Nor does BBG provide any reason to read that statute as applying to once type of
5 phone call and not customer service telephone calls.[2]

6      A person violates Penal Code §632(b) if it records a confidential communication without
7 the knowledge of all participants to the communication and without giving all parties' notice at
8 the outset of the conversation that it is doing so. *Forest E. Olson, Inc. v. Superior Court*, 63 Cal.
9 App.3d 188, 191 (1976). The California Supreme Court in *Shulman v. Group W Productions,*
10 *Inc.*, 18 Cal.4th 200, 234-235 (1998), vigorously enforced the broad protections provided by
11 Cal. Penal Code §632 for California consumers, stating that it:

12        "...provides legal recognition of the individual's reasonable expectation of
       privacy against unauthorized interception and recording of confidential
13        conversations: 'While one who imparts private information risks the betrayal of
       his confidence by the other party, a substantial distinction has been recognized
14        between the secondhand repetition of the contents of a conversation and its
       simultaneous dissemination to an unannounced second auditor, whether that
15        auditor be a person or a mechanical device. . . . Such "'secret monitoring denies
       the speaker an important aspect of privacy of communication – the right to control
16        the nature and extent of the firsthand dissemination of his statements.'"

17      Even if this Court considered the merits of BBG's assertions, as Judge Huff has already
18 ruled, the California Supreme Court has found the location of the call center is irrelevant for
19 purposes of Penal Code §632.

20      Contrary to BBG's spin on the decision, in *Kearney v. Salomon Smith Barney, Inc.*, 39
21 Cal.4th 95 (2006), the California Supreme Court addressed the same situation -- a call center that
22 was not located in California (in that case, Georgia) recording calls involving confidential
23 information to California consumers. The California Supreme Court found even if there was a
24 conflict between the law of a venue that permits such a recording and California law that does
25 not, so long as there are significant contacts with this state (such as both Defendant, the Plaintiffs

26

27 [2] *See* Plaintiffs' accompanying Objection to Declarations and Request for Judicial Notice as to
why the information submitted by BBG is not properly considered, and is irrelevant as it is only
28 addressing monitoring rather than actual recording of confidential communications.

and class members residing here), California's prohibition against recording telephone calls without first obtaining consent at the outset of the telephone call controls. The Court rejected BBG's argument that the Legislature did not intend such a broad construction of the statute:

> The language of section 632 does not explicitly address the issue whether the statute was intended to apply when one party to a telephone call is in California and another party is outside California. The legislatively prescribed purpose of the 1967 invasion-of-privacy statute, however, is 'to protect the right of privacy of the people of this state' (§630), and that purpose certainly supports application of the statute in a setting in which a person outside California records, without the Californian's knowledge or consent, a telephone conversation of a California resident who is within California.

*Id.* at 119. The Court also rejected the argument that customers would have no reason to believe their calls were not being recorded, explaining that Defendants' customers would *not* know or have reason to know that their telephone calls were being recorded absent an explicit advisement at the outset of a telephone call:

> In one passage in its opinion, the Court of Appeal suggested that even in the absence of an explicit advisement, clients or customers of financial brokers such as SSB "know or have reason to know" that their telephone calls with the brokers are being recorded. The Court of Appeal, however, did not cite anything in the record or any authority establishing such a proposition as a matter of law, and in light of the circumstance that California consumers are accustomed to being informed at the outset of a telephone call whenever a business entity intends to record the call, *it appears equally plausible that, in the absence of such an advisement, a California consumer reasonably would anticipate that such a telephone call is not being recorded, particularly in view of the strong privacy interest most persons have with regard to the personal financial information frequently disclosed in such calls.*

*Id.* at 118, n. 10 (emphasis added).

The Court rejected the other argument made by BBG here that the out-of-state law where the call center was located immunized defendant from suit:

> Accordingly, because we have found that the interests of California would be severely impaired if its law were not applied in this context, whereas Georgia's interest would not be significantly impaired if California law rather than Georgia law were applied, we conclude that, with the one exception we discuss below, California law should apply in determining whether the alleged secret recording of telephone conversations at issue in this case constitutes an unlawful invasion of privacy.

*Id.* at 128. The exception the Court referenced was that defendants in that case would not be held liable for past violations of the statute but only for injunctive relief, because it was not on

1 notice that California law might apply to its out-of-state recordings of conversations with
2 California consumers. However, the Supreme Court in July 2006 said that on an on going basis
3 companies could not take advantage of this alleged uncertainty -- specifically rejecting the
4 assertion made by BBG that there is a difference when the call is being made from California by
5 a California consumer, as compared to being received in California by the same person:

6       In light of our decision, of course, out-of-state companies that do business in
        California now are on notice that, with regard to future conduct, *they are subject*
7       *to California law with regard to the recording of telephone conversations made*
        *to or received from California*, and that the full range of civil sanctions
8       afforded by California law may be imposed for future violations.

9 *Id.* at 130-31 (emphasis added). Since the California Supreme Court's position on this issue is
10 unambiguous and has been the law for over four years, BBG's attempt to contradict this ruling
11 by submitting excerpts from the legislative history of Section 632 is objectionable and irrelevant,
12 since legislative history is only relevant where there is an ambiguity that needs clarification.
13 *People v. Robles*, 23 Cal.4th 1106, 1111 (2000). That is not the case here.

14      The situation here is even worse for BBG. The evidence presented here shows that:
15 (i) BBG is based in California, (ii) BBG's own website and letters sent to consumers such as
16 Mr. Keeports directs inquiries to BBG's offices in California, (iii) BBG operators if pressed say
17 that they work for BBG and are in California, and (vi) Plaintiffs and the sub-Class members -- all
18 California residents -- would have no reason to believe their calls were admittedly being
19 recorded, let alone being recorded outside of California, and are never advised as such. Sajfr
20 Decl., ¶6-7, Irina Keeports Decl., ¶9; Keeports Decl., ¶8-18 and Exs. 3 and 4. BBG cannot
21 successfully contradict such disputed material facts by making the unsupported assertion that
22 consumers had no reason to believe they were calling a U.S. call center or would not have any
23 reason to believe their calls made from California were protected under California law.

24      Even if BBG contracted with a call center in Mexico, this does not change the analysis of
25 *Kearney*, since Mexican law would not apply to this controversy under such facts as California
26 law applies to calls made to or received from California. *See, e.g., Hurtado v. Superior Court,*
27 *supra,* 11 Cal.3d at 580 and n.2 (California's choice-of-law governmental interest analysis is the
28 same for choice of application between California and Mexican law as between two states; court

1  rejected application of Mexican law as Mexico had no interest to be protected). In fact, *Kearney*
2  cited *Hurtado* in undertaking its choice of law analysis. With whom BBG might have
3  subcontracted to handle call center operations or where that center is located does not control the
4  outcome of this analysis based on the above facts.

5  Moreover, in *Kearney*, the California Supreme Court stated that it could not assume that
6  the telephone conversations at issue were not "confidential communications" within the meaning
7  of Penal Code §632. *Id.* Here, the evidence presented shows BBG requires credit card
8  information be provided at the beginning of every call, and Plaintiffs reasonably believed the
9  communications would be treated as confidential based on the fact credit card information was
10 being demanded from them and without any advance advisory such calls were being monitored
11 or recorded. *See* Mansfield Decl., Ex. 15; Sajfr Decl. ¶6-7, Irina Keeports Decl., ¶9; Keeports
12 Decl. at ¶8-18. *See also Membrila v. Receivables Perf. Mgt. LLC*, 2010 WL 1407274 (S.D.
13 Cal., Apr. 10, 2010) (company that does not adequately advise individual at the inception of a
14 telephone call that call is being recorded can be held liable for violation of Penal Code §632,
15 citing *Kearney*).

16 Based on the evidence adduced so far, this Court cannot conclude that whether a
17 California-based company may have outsourced customer calls to its domestic "1-800" number
18 to a call center to Mexico and told no one about it -- indeed instructed its representatives to
19 advise consumers to the contrary -- means that California law does not apply. If that were the
20 case, companies could simply evade the requirements of Section 632, and the protections
21 provided to California consumers under *Kearney*, simply by contracting with companies located
22 outside the United States, or even California, and then claim the law did not apply because that is
23 where the call center is based. There is no indication in the text of the law, or in the legislative
24 history cited by BBG, that the Legislature intended to create such a huge loophole. The Supreme
25 Court in *Kearney* specifically rejected that claim over four years ago when it stated companies
26 are subject to California law when they engage in confidential telephone calls with California
27 residents. What Plaintiffs -- both California residents -- show in the above Declarations is not
28 that they called BBG from abroad, but that they called BBG at the domestic 800 number

1 provided by BBG in billing statements after they received their credit card statement in
2 California. The Section 632 claim cannot be summarily adjudicated against the Plaintiffs.

3 **XII. THE MOTION MUST BE DENIED OR CONTINUED BASED ON BBG'S**
   **FAILURE TO COMPLY WITH ITS DISCOVERY OBLIGATIONS**
4

5       Finally, pursuant to Rule 56(f) of the Fed. R. Civ. P., if a party is prevented from being
6 able to present facts essential to its opposition to a summary judgment motion, the Court may
7 deny the motion, order a continuance, or "issue any other just order." Here, as set forth in more
8 detail in the Mansfield Decl. at ¶24, BBG has refused so far to date to produce a single
9 document, respond to a single interrogatory, or provide any information about BBG Global AG
10 or B-Tel in response to Requests for Admissions on the grounds it is not under BBG's "control".
11 It makes this claim even though it is capable of providing Declarations from numerous of BBG
12 Global's employees -- most notably Gregorio Galicot, who is also an officer or director of both
13 BBG and BBG Global AG. Motions to compel have been filed with Magistrate Judge Stormes
14 over these issues.

15       In addition, even though Mr. Galicot is an officer of BBG Global AG and submitted a
16 Declaration on its behalf, BBG Global AG designated Ms. Fedier to testify on behalf of BBG
17 Global AG. Her deposition is going forward in London, England on November 16, 2011 by
18 agreement to accommodate the request of Defendant. *Id. Celotex,* 477 U.S. at 322 (summary
19 judgment appropriate only if no issue of fact exists "*after adequate time for discovery*"). Under
20 Fed. R. Civ. P. 56(f), the Court should deny the Motion or order a continuance of at least 60 days
21 to enable the noticed deposition to be taken and reviewed, and permit the Court rule on several
22 motions to compel BBG to produce documents and properly respond to outstanding discovery.

23 **XIII. CONCLUSION**

24       For all the reasons set forth above, this Court should deny BBG's Motion in its entirety.
25 In the alternative, the Court should issue a continuance for at least 60 days.

26 Dated: November 10, 2011                    CONSUMER LAW GROUP OF CALIFORNIA

27                                             By:  __S/Alan M. Mansfield__
                                                   Alan M. Mansfield
28                                                 alan@clgca.com

---

MEMO OF P&As IN OPP. TO BBG MOTION FOR          - 25 -          CASE NO.: 10-CV-2341-AJB (NLSx)
SUMMARY JUDGMENT

9466 Black Mountain Road, Suite 225
San Diego, CA 92126
Tel: (619) 308-5034
Fax: (888) 341-5048

WHATLEY DRAKE & KALLAS LLC
Joe R. Whatley, Esq.
jwhatley@wdklaw.com
Patrick J. Sheehan, Esq. (Admitted *Pro Hac Vice*)
psheehan@wdklaw.com
1540 Broadway, 37th Floor
New York, NY 10036
Tel: (212) 447-7070
Fax: (212) 447-7077

Attorneys for Plaintiffs Vlastimil Sajfr and David
Keeports